# United States Court of Appeals
## For the First Circuit

Nos. 18-1778
    18-1813
    18-1867
    18-1976

THE PARENT/PROFESSIONAL ADVOCACY LEAGUE; DISABILITY LAW CENTER,
INC.; M.W., a minor, by his temporary guardian, F.D., on behalf
of himself and other similarly situated students,

Plaintiffs, Appellants/Cross-Appellees,

S.S., a minor, by his mother, S.Y., on behalf of himself and
other similarly situated students,

Plaintiff,

v.

CITY OF SPRINGFIELD, MASSACHUSETTS; SPRINGFIELD PUBLIC SCHOOLS,

Defendants, Appellees/Cross-Appellants,

DOMENIC SARNO, in his official capacity as Mayor of City of
Springfield; SUPERINTENDENT DANIEL J. WARWICK, in his official
capacity as Superintendent of Springfield Public Schools,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

Jeff Goldman, with whom Robert E. McDonnell, Michael D. Blanchard, Elizabeth Bresnahan, Matthew T. Bohenek, Morgan, Lewis & Bockius LLP, Alison Barkoff, Deborah A. Dorfman, Sandra J. Staub, Center for Public Representation, Ira Burnim, Jennifer Mathis, and Bazelon Center for Mental Health Law were on brief, for appellants/cross-appellees.

Aaron M. Panner, Matthew M. Duffy, and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. on brief for Former U.S. Department of Education Officials, Massachusetts Advocates for Children, Massachusetts Association for Mental Health, and Mental Health America, amici curiae.

Howard Schiffman, Thomas P. DeFranco, and Schulte Roth & Zabel LLP on brief for National Disability Rights Network, American Association of People with Disabilities, and National Council on Independent Living, amici curiae.

Stephen L. Holstrom and Lisa C. deSousa, with whom Edward M. Pikula, City of Springfield Law Department, Melinda M. Phelps, and Bulkley, Richardson & Gelinas LLP were on brief, for appellees/cross-appellants.

August 8, 2019

LYNCH, **Circuit Judge**.  These consolidated appeals raise significant questions about the overlap between Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131–12134, and the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., about class certification in special education litigation, and about organizations' standing to sue on behalf of certain constituents.

The underlying suit alleges that the City of Springfield, Massachusetts, and Springfield Public Schools (SPS) violated Title II of the ADA by unnecessarily segregating students with mental health disabilities in a separate and inferior school, the Springfield Public Day School (SPDS).  S.S., then an SPDS student, brought the suit on his own behalf and on behalf of a class of all students with a mental health disability who are or have been enrolled at SPDS.  Two associations, the Parent/Professional Advocacy League (PPAL) and Disability Law Center (DLC), joined S.S. as plaintiffs.  They seek injunctive and declaratory relief, including an order that defendants provide the class plaintiffs with "school-based behavior services in neighborhood schools to afford them an equal educational opportunity and enable them to be educated in neighborhood schools."

The district court denied class certification.  S.S. by S.Y. v. City of Springfield (S.S. II), 318 F.R.D. 210, 224 (D.

Mass. 2016).  It later ruled that the associations had standing but granted the defendants' motion for judgment on the pleadings as to the associations.  S.S. by S.Y. v. City of Springfield (S.S. III), 332 F. Supp. 3d 367, 379 (D. Mass 2018).

The plaintiffs' consolidated appeal challenges the district court's rulings that this suit was subject to the IDEA's exhaustion requirement and that the proposed class did not satisfy Federal Rule of Civil Procedure 23(a)'s requirements for certification.  After briefly addressing a threshold issue related to the grant of a motion to intervene, we reject plaintiffs' arguments that the district court erred as to class certification. The defendants' appeal argues that the district court erred in concluding that PPAL and DLC had standing.  We agree that these organizations lack standing to pursue the claims in the complaint, and we affirm the district court's grant of judgment on the pleadings as to PPAL and DLC on that ground.

I.

To begin, we give background on the ADA and IDEA.  We next turn to this suit's history.

A.   The ADA

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity." 42 U.S.C. § 12132. Title II's regulations generally require a public entity to make "reasonable modifications" to its "policies, practices, or procedures" when necessary to avoid violations of Title II. 28 C.F.R. § 35.130(b)(7)(i).

Title II, as implemented by regulation, prohibits two types of discrimination relevant here. First, regulations implementing Title II prohibit inequality in services, programs, or activities provided by public entities. Public entities may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others" or "[p]rovide a qualified individual with a disability with an aid, benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." Id. §§ 35.130(b)(1)(ii)-(iii).

Second, the regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." Id. § 35.130(d). "The most integrated setting" is defined as a setting that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." Id. pt. 35, app. B.

Interpreting Title II and the integration and reasonable modification regulations, the Supreme Court held in Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999), that the ADA prohibits the unjustified institutionalization of people with mental disabilities. Id. at 600. The Court concluded that public entities must provide "community-based [services] for persons with mental disabilities," when "the affected persons do not oppose such" services, and the community placement "can be reasonably accommodated." Id. at 607. Cases like this one challenging the separation of individuals with disabilities under the ADA are often called Olmstead cases.

B. The IDEA

The IDEA provides federal funds to assist states in educating children with disabilities "and conditions such funding upon a State's compliance with extensive goals and procedures." Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 295-96 (2006) (quoting Bd. of Ed. v. Rowley, 548 U.S. 176, 179 (1982)). These conditions include the commitment to furnish a "[f]ree appropriate public education" (FAPE), 20 U.S.C. § 1412(a)(1), and to do so in the "[l]east restrictive environment" (LRE), id. § 1412(a)(5).

As defined in the IDEA, a FAPE encompasses both "special education and related services." Id. § 1401(9). "Special education" is "specially designed instruction." Id. § 1401(29).

"Related services" are the support services -- including "psychological" and "counseling services" -- "required to assist a child to benefit from" that instruction. Id. § 1401(26)(A). A state must also provide special education and related services "in conformity with the [child's] individualized education program," or IEP. Id. § 1401(9)(D).

IEPs are "comprehensive plan[s]" developed by the child's teachers, school officials, and parents. Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 994 (2017). The IDEA requires that every IEP document the child's "present levels of academic achievement," identify "measurable annual goals," and outline the "special education and related services" to be given so that the child can "advance appropriately toward [those] goals." 20 U.S.C. §§ 1414(d)(1)(A)(i)(I), (IV).

Finally, every IEP must specify "the extent, if any, to which the child will not participate with nondisabled children in the regular class." Id. § 1414(d)(1)(A)(i)(V). This requirement reflects the state's obligation to educate children in the LRE, which the IDEA defines as:

> (5) Least restrictive environment
>     (A) In general
>     To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when

> the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

Id. § 1412(a)(5)(A).

The IDEA also details procedures for resolving disputes between parents and schools about the content of an IEP. Parents may file a complaint with the appropriate local or state educational agency, id. § 1415(b)(6), spurring a "[p]reliminary meeting," id. § 1415(f)(1)(B)(i), which, if unsuccessful in resolving the dispute, leads to a mediation process, id. § 1415(e), and then ultimately to a formal "due process hearing," id. § 1415(f)(1)(A).

Hearing officers can grant substantive relief, such as reimbursement for private school tuition or an order that a school district must offer the student an appropriate educational program. See Sch. Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 370 (1985) (discussing both prospective relief and reimbursement). But relief may only be granted "based on a determination of whether the child received a [FAPE]."[1] 20 U.S.C. § 1415(f)(3)(E)(i). The standard for determining whether a child receives a FAPE is whether the educational program offered to the

_____

[1] For procedural violations, a hearing officer may find that a child did not receive a FAPE "if the procedural inadequacies . . . caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

child is "reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." Endrew F., 137 S. Ct. at 1001.

In Massachusetts, the initial hearing officer's decision can be appealed to the Board of Special Education Appeals (BSEA). The general rule is that only after these procedures have been exhausted may parents seek review of IDEA claims in a civil action in state or federal court. See id. § 1415(i)(2)(A).

C.   The IDEA's Exhaustion Requirement

The Supreme Court first considered the interactions between the IDEA and antidiscrimination laws like the ADA in Smith v. Robinson, 468 U.S. 992 (1984). Smith held that the IDEA totally foreclosed claims asserted under statutes other than the IDEA to challenge the appropriateness of a disabled child's education. See id. at 1009.

But Congress overrode Smith in 1986 when it added an exhaustion requirement to the IDEA. The provision, at 20 U.S.C. § 1415(l), reads:

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative] procedures . . . shall be exhausted to the

same extent as would be required had the action been brought under [the IDEA].

Id. Under § 1415(*l*), a plaintiff is thus not barred from bringing claims under the ADA even if those claims allege the denial of an adequate education. However, a plaintiff bringing suit under the ADA must first exhaust the IDEA's administrative procedures if the suit is "seeking relief that is also available under [the IDEA]." Id.

The Supreme Court first interpreted this key phrase in 2017, in Fry v. Napoleon Community Schools, 137 S. Ct. 743 (2017).[2] Fry held that a suit is subject to the IDEA's exhaustion requirement if it "seek[s] relief for the denial of a FAPE, because that is the only 'relief' the IDEA makes 'available.'" Id. at 752 (quoting 20 U.S.C. § 1415(*l*)); see also id. at 753-55. And, in discerning "whether a suit indeed 'seeks' relief for such a denial, a court should look to the substance, or the gravamen, of the plaintiff's complaint." Id. at 752; see also id. at 755-57. That is in contrast to analyses under other, "stricter exhaustion statute[s]" that ask "whether the suit could have sought [certain]

---

[2] The Frys brought suit under Title II of the ADA and § 504 of the Rehabilitation Act, 29 U.S.C. § 794, for "denying [their daughter] equal access" to her elementary school by "refus[ing] to reasonably accommodate" their daughter's use of a service animal for her cerebral palsy. Fry, 137 S. Ct. at 752 (internal quotation marks omitted). The Supreme Court did not undertake an exhaustion analysis of the Frys' complaint, remanding on that question. Id. at 758-59.

relief" or "whether [certain] remedies are available under that law."  Id. at 755 (emphasis added)(internal quotation marks omitted).

Even if a court determines that a complaint seeks relief that is available under the IDEA, exhaustion is not required where it "would be futile or inadequate."  Honig v. Doe, 484 U.S. 305, 327 (1988).  The plaintiffs argue that two species of futility are relevant here, one to the class plaintiffs and the other to DLC and PPAL.  But for reasons explained in our analysis, we reach only the argument about the class plaintiffs.

## II.

### A.  The Complaint

S.S., PPAL, and DLC filed the operative complaint in 2015.[3]  PPAL is an organization that advocates for improved access to services for children with a mental health disability.  And DLC is designated under the Protection and Advocacy for Individuals with Mental Illness Act (PAIMI), 42 U.S.C. § 10801 et seq., as the protection and advocacy system (P & A) for individuals with mental health disabilities in Massachusetts.  S.S., then a high school student at SPDS, had been diagnosed with Attention Deficit and

---

[3]     What we refer to as "the complaint" is the First Amended Class Action Complaint.  S.S. and PPAL filed an initial complaint in 2014 and then sought leave to amend, which was granted, allowing S.S. and PPAL, now joined by DLC, to file the First Amended Class Complaint.  S.S. by S.Y. v. City of Springfield (S.S. I), 146 F. Supp. 3d 414, 422 (D. Mass. 2015).

- 11 -

Hyperactivity Disorder and depression. S.S. sought to sue on behalf of a class of "[a]ll students with a mental health disability who are or have been enrolled in SPS's Public Day School who are not being educated in an SPS neighborhood school." This class, the complaint alleges, contains PPAL and DLC constituents.

The complaint alleges the following facts about Springfield's public school system. SPS, the second largest school district in Massachusetts, enrolls around 26,000 students in about fifty schools. Most of those schools are neighborhood schools -- elementary and middle schools that enroll students based on their residential addresses and high schools that enroll students through a choice program.

Within SPS, SPDS comprises three schools, an elementary, middle, and high school. SPDS operates as an "alternative [set of] schools . . . for students with social emotional behavioral disabilities." It enrolls about 230 students, each of whom has been diagnosed with a mental health disability that SPS has determined interferes with his or her learning and each of whom has an IEP that places him or her at SPDS. About 400 other students with mental health disabilities that similarly interfere with their learning attend neighborhood schools; their IEPs do not require placement at SPDS.

The complaint alleges that both Springfield and SPS[4] discriminate against the plaintiff class under Title II by providing unequal educational services at SPDS, see 28 C.F.R. §§ 35.130(b)(1)(i), (ii), and by denying them the opportunity to receive educational services in the most integrated setting appropriate to their needs, see 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d). The complaint requests this substantive relief:

> A. Order that Plaintiff S.S. may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.
> B. Order and declare that Defendants are violating the rights of S.S. and other similarly situated children under Title II of the ADA . . . and its implementing regulations.
> C. Preliminarily and permanently enjoin Defendants, their . . . agents, employees and assigns, and all persons acting in concert with them to provide Plaintiff S.S., PPAL and DLC constituents, and the Plaintiff class with the school-based behavior services they need to enjoy equal educational opportunity and receive educational programs and services in the most integrated setting, as required by Title II of the ADA.

The complaint defines the "essential components" of school-based behavior services (SBBS) as:

> (a) a comprehensive assessment, including determination of the purpose and triggers for the child's behavior; (b) a school-based

---

[4] The complaint also named Springfield's mayor and schools superintendent as defendants. But the district court dismissed these claims as "redundant" of those against the public entities. S.S. I, 146 F. Supp. 3d at 426. And the plaintiffs have not appealed that dismissal.

- 13 -

intervention plan that relies on positive support, social skills training, a care coordinator, and adjustments as needed to curriculum or schedule; (c) training for school staff and parents in implementing the plan; and (d) coordination with non-school providers involved with the child.

Defendants responded with a motion to dismiss, asserting several grounds, including that S.S. had failed to exhaust his administrative remedies. In denying the motion to dismiss as to the claims against Springfield and SPS,[5] the district court held that S.S. had exhausted his administrative remedies before bringing this suit. S.S. by S.Y. v. City of Springfield (S.S. I), 146 F. Supp. 3d 414, 424 (D. Mass. 2015). S.S. had filed a Request for a Hearing with the BSEA asserting that his IEP violated the IDEA's FAPE and LRE requirements and raising the ADA claims in this suit. A BSEA hearing officer dismissed S.S.'s individual and classwide ADA claims for lack of jurisdiction and denied S.S.'s IDEA claim based on a finding that his IEP was reasonably calculated to offer him a FAPE.

B.   Motion for Class Certification

The district court denied the plaintiffs' motion for class certification on alternative grounds. S.S. II, 318 F.R.D. at 224. In the district court's view, the IDEA's exhaustion

---

[5]   As already stated, the district court dismissed the claims against the individual defendants. S.S. I, 146 F. Supp. 3d at 426.

requirement "provide[d] one basis" for doing so.  Id. at 222.
Writing two years before Fry, the district court concluded that,
because "the members of the proposed class may achieve a remedy
through an IDEA administrative hearing related to the claims raised
here," that statute's exhaustion requirement "applie[d]."  Id.
Although S.S. had exhausted his administrative remedies, the
proposed class was not limited to students who had gone through
the IDEA's procedures.  Id. at 221.  And, the district court
stated, plaintiffs "have not argued that there is an exception to
the exhaustion requirement" for class actions.  Id.  As a result,
the district court held that class certification should be denied:
the complaint did not allege that all unnamed members of the class
had exhausted, but the district court determined that § 1415(*l*)
required them to do so.  See id. at 222.

The district court also concluded that the plaintiffs
had not satisfied Federal Rule of Civil Procedure 23(a)'s
prerequisites for class certification.  See id.  There was no
"question[] of law or fact common to the class," the district court
held, and S.S. could not serve as a "typical" or "adequate[]" class
representative because he had exhausted his IDEA administrative
remedies while other class members had not.  See id. at 223-24
(quoting Fed. R. Civ. P. 23(a)).

C.  Motion for Judgment on the Pleadings

The defendants next filed a motion for judgment on the pleadings on the claims of DLC and PPAL. They argued that the associations lacked standing to bring these claims on behalf of their constituents and, in the alternative, that the associations were subject to the IDEA's exhaustion requirement but had failed to exhaust. Although the district court found that DLC and PPAL had standing, it granted the motion. S.S. III, 332 F. Supp. 3d at 370. Writing after Fry, the district court concluded that § 1415(*l*) required exhaustion and that no exception relieved DLC and PPAL of their obligation to exhaust the IDEA's administrative procedures. Id. at 376-78.

D.  M.W.'s Intervention for Purposes of Appeal and the Parties' Appeal and Cross-Appeal

While the motion for judgment on the pleadings was pending in the district court, S.S. turned eighteen and withdrew from the suit.[6] M.W., a former SPDS student who does not attend a neighborhood school, asked the district court for permission to intervene solely for purposes of appealing the ruling on the motion for class certification. The district court granted the motion.

---

[6] Simultaneous with S.S.'s withdrawal, another SPDS student who had exhausted IDEA administrative remedies sought to intervene in the district court case and in the plaintiff's petition to appeal the denial of class certification to the First Circuit. This student's motions were withdrawn before they were acted on.

M.W. then appealed the district court's denial of class certification. PPAL and DLC appealed the judgment against them. Springfield and SPS cross-appealed the district court's ruling that PPAL and DLC had standing and its grant of M.W.'s motion to intervene for purposes of appeal.

III.

We first address a threshold issue raised in defendants' cross-appeal: did the district court abuse its discretion in granting M.W.'s motion to intervene for purposes of appealing the denial of class certification? See Peaje Investments LLC v. García-Padilla, 845 F.3d 505, 515 (1st Cir. 2017) (reviewing disposition of motion to intervene for abuse of discretion).

We see no abuse of discretion. The district court relied on United Airlines, Inc. v. McDonald, 432 U.S. 385 (1977), in concluding that M.W.'s motion to intervene was timely and appropriate. In McDonald, the Supreme Court endorsed the grant of a motion like the one here -- to intervene for purposes of appealing an order denying a motion for class certification. Id. at 387, 396. The motion in McDonald had been filed by a member of the proposed class within the period for appealing the entry of final judgment. Id. at 390. The same is true here: M.W., a member of the proposed class, filed the motion to intervene for purposes of appealing the class certification order fifteen days after the district court entered its final order granting the

motion for judgment on the pleadings; fifteen days is within the time period for filing an appeal under Federal Rule of Appellate Procedure 4. See id.; see also Fed. R. App. P. 4(a)(1)(A) (allowing thirty days to file a notice of appeal).

The defendants' counter-arguments are misplaced. The defendants object that M.W.'s intervention is "[i]nappropriate" because he has not exhausted his IDEA administrative remedies and is therefore "unsuitable to represent the class in any capacity." But M.W. seeks to appeal the district court's ruling refusing to certify a class including persons who had not exhausted IDEA remedies. And so M.W.'s failure to have exhausted cannot make him an inappropriate appellant of that ruling. See McDonald, 432 U.S. at 394-95 ("[I]t would be circular to argue that [an] unnamed member of the putative class was not a proper party to appeal, on the ground that her interests had been adversely determined in the trial court."). Defendants' insistence that "M.W. is not an adequate class representative and whether one may arise is wholly speculative" similarly misses the point. M.W. is a suitable party to appeal from the district court's denial of class certification because M.W. is a member of the proposed class; those interests would be impaired absent intervention given S.S.'s decision to

withdraw as named plaintiff.  See id. at 394; Fed. R. Civ. P. 24(a).  M.W.'s appeal is properly before us.[7]

                                IV.

       We turn now to M.W.'s appeal.  M.W. first challenges the district court's conclusion that § 1415(*l*)'s exhaustion rule attached here, and the parties appear to argue that the exhaustion issue is at the heart of this case.  Our exhaustion analysis, as described below, directly pertains to our decisions on class certification and associational standing.  Applying Fry for the first time in this circuit, we conclude that the complaint "seek[s] relief that is also available" under the IDEA.[8]  20 U.S.C. § 1415(*l*).  We then turn directly to the issue of class certification.

---

[7]     M.W., a minor, moved to intervene and initially brought this appeal by his parents, L.N. and A.N.  After oral argument, plaintiffs moved to substitute F.D. as M.W.'s representative.  The motion explained that, following L.N.'s death just before oral argument in this court, F.D. and A.N. filed competing petitions for guardianship of M.W., and F.D. was granted temporary guardianship of M.W.  We granted the motion to substitute F.D. for so long as F.D. is authorized to be M.W.'s general guardian under state law.  See Fed. R. Civ. R. 17(c)(1)(A); Fed. R. App. P. 43(a), (b).

[8]     Our review of the district court's exhaustion ruling is de novo.  This is true whether we treat the exhaustion ruling as a matter of class certification or, as the parties do in their briefs, as an independent issue.  Motions to dismiss and legal rulings embedded in class certification decisions are both reviewed de novo.  García-Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir. 2009) (citing Tardiff v. Knox Cty., 365 F.3d 1, 4 (1st Cir. 2004)).

- 19 -

A.  The Complaint "Seek[s] Relief that is Also Available Under"
    the IDEA

Fry was decided after the district court's class certification order, and M.W. argues that Fry made clear that the "IDEA exhaustion rule does not apply here." We now clarify that § 1415(l), as interpreted in Fry, subjects the type of ADA claim being made here to that exhaustion rule.[9]

When faced with a complaint brought under the ADA against a public school, Fry instructs, a court should determine whether the gravamen of the complaint "concerns the denial of a FAPE" -- in which case § 1415(l) requires exhaustion -- or "instead addresses disability-based discrimination" -- in which case § 1415(l)'s rule does not apply. 137 S. Ct. at 756. This distinction is grounded in the "diverse means and ends of the statutes." Id. at 755. While "the IDEA guarantees individually tailored educational services, . . . Title II . . . promise[s] non-discriminatory access to public institutions." Id. at 756.

Fry recognized that "[t]he same conduct might violate" both the ADA and the IDEA. Id. "But still," it stated, "the statutory differences . . . mean that a complaint brought [against a school] under Title II . . . might" nevertheless be free from

---

[9]    Although we, following Fry, "sp[eak] in terms of the 'complaint,'" our conclusion, as our analysis will make clear, would be the same if the inquiry were "claim-by-claim." Wellman v. Butler Area Sch. Dist., 877 F.3d 125, 132 (6th Cir. 2017) (noting ambiguity about whether Fry's inquiry is claim-specific).

- 20 -

the IDEA's exhaustion requirement if it "seek[s] relief for simple discrimination, irrespective of the IDEA's FAPE obligation." Id. On inspection, the complaint here in essence contests the provision of educational services secured by the IDEA; its gravamen is not "simple discrimination."

On its surface, the complaint pleads disability-based discrimination: it alleges that the defendants are violating the ADA by unnecessarily segregating students with mental health disabilities in a separate and unequal educational program. And the complaint never uses the term FAPE. Yet, the crux of the complaint is that the defendants failed to provide the educational instruction and related services that the class plaintiffs need to access an appropriate education in an appropriate environment. That is not a claim of simple discrimination; it is a claim "contesting the adequacy of a special education program." Id. at 755.

The complaint's gravamen is also revealed in the legal allegations. The sole count of the complaint alleges that the defendants are "[d]enying" students the "opportunity to receive educational programs and services in the most integrated setting appropriate to their needs." And Count I also alleges that the school system is "[d]enying" students the "opportunity to . . . benefit from educational services." These allegations track the language of the ADA's regulations, see 28 C.F.R. §§ 35.130(b),

(d), but they are nonetheless claims about obligations under the IDEA to educate students in the regular classroom with their nondisabled peers "[t]o the maximum extent appropriate," 20 U.S.C. § 1412(a)(5)(A), and to offer students an appropriate educational benefit, see Endrew F., 137 S. Ct. at 1001. These allegations are, in great part, simply another way of saying, in IDEA terms, that the school system has not provided the necessary special educational services to allow students to be educated in the LRE. See, e.g., C.D. by & through M.D. v. Natick Pub. Sch. Dist., 924 F.3d 621, 630 (1st Cir. 2019). Indeed, here, the members of the class were placed in SPDS by their IEPs, which, as we outlined above, must provide an appropriate education and must comport with the IDEA's LRE requirement.

Concretely, it is revealing that S.S. initially "invoked the IDEA's formal procedures to handle [his] dispute." Fry, 137 S. Ct. at 757. The IDEA claims raised in S.S.'s due process complaint and ultimately adjudicated by the BSEA concern the adequacy of the special education services provided to S.S. and the appropriateness of his placement. When S.S. filed this suit in federal court, he dropped the IDEA claims, but the essence of his grievance did not shift.

Nor do the facts here show "that the move to a courtroom came from a late-acquired awareness that the school had fulfilled its FAPE obligation and that the grievance involves something else

- 22 -

entirely." Id. To the contrary, the plaintiffs emphasize that they do not concede that any of the unnamed class plaintiffs were receiving a FAPE in the LRE. In Fry, the Frys and the school district agreed that the district was providing a FAPE. Id. at 752. To the Supreme Court, this fact signaled that the Frys' complaint sought relief for "infringe[ment] on [the child's] right to equal access -- even if [the school's] actions complied in full with the IDEA's requirements." Id. at 758. The plaintiffs' suit cannot be similarly isolated from the special education services guaranteed by the IDEA.

To reinforce this point that the relief plaintiffs seek cannot be isolated from relief available under the IDEA, consider an example. A student sues her school under an antidiscrimination statute alleging that a teacher struck her "out of animus or frustration." Id. at 756 n.9. Even assuming that the student has an IEP and that striking the student could violate the IEP, the "substance" of this suit "is unlikely to involve the adequacy of special education -- and thus is unlikely to require exhaustion." Id. "A telling indicator of that conclusion," Fry explained, is that the same suit could be filed in contexts not covered by the IDEA. Id. That is, "a child could file the same kind of suit against an official at another public facility for inflicting such physical abuse -- as could an adult subject to similar treatment by a school official." Id.

The plaintiffs argue that a suit like theirs could be filed in contexts where "there is no FAPE obligation." Id. at 756. They liken their suit to Olmstead, which involved ADA claims of unnecessary segregation in medical institutions, not schools. See 527 U.S. at 593. But the plausibility of bringing an Olmstead suit against another public entity does not indicate that this suit concerns simple discrimination. Olmstead claims concern whether the defendant public entity provides proper "treatment," accommodations, and placements. Id. at 607. And in the school context, a challenge to a student's treatment, services, accommodations, and placements is a challenge to the appropriateness of an educational program. See 20 U.S.C. § 1401(26) (describing the services that may compose an educational program).

Other circuits have similarly concluded that complaints "seek[] relief" available under the IDEA when alleging that discriminatory treatment resulted in the denial of an adequate education or in an inappropriate placement. For example, Wellman v. Butler Area School District, 877 F.3d 125 (3d Cir. 2017), required exhaustion of claims brought under the ADA, the Rehabilitation Act, and § 1983 alleging that a school failed to provide academic and other accommodating services to a student after he sustained a head injury. Id. at 135. And claims that schools isolated or separated disabled students have been

- 24 -

subjected to IDEA exhaustion where those claims allege that the effects of the isolation or separation were educational.[10] So, exhaustion was required in J.M. v. Francis Howell School District, 850 F.3d 944 (8th Cir. 2017), of claims that a school's "use of isolation and physical restraints failed to provide proper 'sufficient "supportive services" to permit [J.M.] to benefit from . . . instruction,' and ultimately 'denied [J.M.] . . . the benefits of public education.'" Id. at 949 (quoting Fry, 137 S. Ct. at 748-49, 757).

Resisting the conclusion that their complaint seeks relief that is available under the IDEA, the plaintiffs emphasize that "the fact that a school has provided a FAPE in the LRE does not preclude a claim of unlawful segregation under the ADA." And they similarly state that the IDEA, unlike the ADA, does not require equal educational opportunity. But the observation that the statutes are "independent" and sometimes diverge does not help the plaintiffs. More significant for our purposes is that the statutes sometimes overlap.[11] In this case, that overlap is such

---

[10] The district court cases on which the plaintiff relies are distinguishable at least on this ground: the alleged effects of the physical abuse and isolation were not educational. See Abraham P. v. Los Angeles Unified Sch. Dist., No. CV 17-3105, 2017 WL 4839071 (C.D. Cal. Oct. 5, 2017); GM ex rel Mason v. Lincoln Cty. Sch. Dist., No. 6:16-CV-01739-JR, 2017 WL 2804996, (D. Or. Apr. 21, 2017), report and recommendation adopted, No. 6:16-CV-01739-JR, 2017 WL 2804949 (D. Or. June 28, 2017).

[11] Tellingly, the plaintiffs accuse the district court of

that, in pleading what are on the surface ADA claims, the plaintiffs' complaint in substance "seek[s] relief that is also available under" the IDEA. We repeat that our conclusions about exhaustion are relevant to our class certification and associational standing analyses.

We address the plaintiffs' alternative argument that, in an IDEA suit seeking systemic relief, no plaintiff need exhaust because such exhaustion would be futile. The plaintiffs assert that this class action alleges "systemic failures."

Other circuits have defined an exception to the IDEA's exhaustion rule for "systemic" suits. But, to fall under that exception, the alleged violations must be "truly systemic . . . in the sense that the IDEA's basic goals are threatened on a system-wide basis." Hoeft v. Tuscon Unified Sch. Dist., 967 F.2d 1298, 1305 (9th Cir. 1992). For example, the exhaustion requirement has been relaxed or waived in suits alleging systemwide violations of the processes for identifying and evaluating students with disabilities. See DL v. D.C., 713 F.3d 120, 124 n.4 (D.C. Cir. 2013); J.G. v. Bd. of Educ. of the Rochester City Sch. Dist., 830 F.2d 444, 445 (2d Cir. 1987) (alleging systemwide failures at

_____

"limit[ing]" or "restrict[ing]" the ADA's integration and equal access mandates by requiring IDEA exhaustion here. Implicit in this argument is an admission that a complaint alleging violations of the ADA could in theory also allege violations of the FAPE and LRE requirements.

multiple stages of the IDEA's processes for evaluating and placing students in special education).  Suits labeled "systemic" also tend to "challenge[] policies or practices," or administrative failures, "at the highest administrative level."  Hoeft, 967 F.2d at 1305; see also J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 114 (2d Cir. 2004); cf. Christopher W. v. Portsmouth Sch. Comm., 877 F.2d 1089, 1095 (1st Cir. 1989) (stating that exhaustion may not be required for review of such policies if they present "a pure matter of law" (quoting Ezratty v. Comm. of P.R., 648 F.2d 770, 774 (1st Cir. 1981)).

The plaintiffs' claims are not "systemic" in the sense contemplated by any such exception.  A finding that one student with a certain type and degree of mental health disability should have been mainstreamed would not mean that another student with a different type, or even just a different degree, of mental health disability should have received the same services or been mainstreamed.  And, as we will explain further below in our consideration of commonality, plaintiffs do not challenge an identifiable, uniform system-wide policy "enforced at the highest administrative level."  Hoeft, 967 F.2d at 1305.  In sum, even if this court were to recognize a "systemic" claims exception to the IDEA's exhaustion requirement, this case would not fall under such an exception.  So we need not, and do not, decide whether to adopt such an exception in this circuit.

B.  Class Certification

The district court denied class certification on both Rule 23 and exhaustion grounds.  We deal with both.  First, plaintiffs' failure to satisfy Rule 23(a)'s commonality requirement provides a basis for affirming the denial of class certification.[12]  See García-Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir. 2009) (noting that denials of class certification are reviewed for abuse of discretion).

Rule 23(a)(2) makes the identification of "questions of law or fact common to the class" a prerequisite for class certification.[13]  Fed. R. Civ. P. 23(a)(2).  A question is common if it is "capable of classwide resolution -- which means that

---

[12]    We need not address plaintiffs' other arguments that the district court erred in holding that the class failed Rule 23(a)'s adequacy and typicality requirements and in implying that the plaintiffs do not "seek relief appropriate under Rule 23(b)(2)."

[13]    Rule 23(a) provides:

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
        (1) the class is so numerous that joinder of all members is impracticable;
        (2) there are questions of law or fact common to the class;
        (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
        (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). Under that definition, the Supreme Court explained in Wal-Mart, what really "matters to class certification . . . is not the raising of common 'questions'" as much as "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Id. (alteration in original) (emphasis in original) (quoting Richard A. Nagarenda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)). Those common answers typically come in the form of "a particular and sufficiently well-defined set of allegedly illegal policies [or] practices" that work similar harm on the class plaintiffs.[14] Parsons v. Ryan, 754 F.3d 657, 679 (9th Cir. 2014).

_____

[14]    Plaintiffs agree with our basic account of the law.  The cases plaintiffs cite each involved a definable policy or practice imposed by a single entity or a small group of actors; these features facilitated the formulation of questions apt for class resolution.  See Parsons, 754 F.3d at 678 (seeing sufficient commonality where "either each of the policies and practices is unlawful as to every inmate or it is not"); Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of Chi., 797 F.3d 426, 440 (7th Cir. 2015) (finding requisite commonality where "uniform criteria and [a] single-decision maker" allegedly unlawfully closed schools); Scott v. Family Dollar Stores, Inc., 733 F.3d 105, 114 (4th Cir. 2013), cert. denied, 134 S. Ct. 2871 (Mem.) (2014) (reversing district court's denial of class certification because the complaint alleged four company-wide policies that could be driving the alleged discrimination); Yates v. Collier, 868 F.3d 354, 363 (5th Cir. 2017) (affirming class certification where district court found that heat in a prison was so excessive that it was

Consistent with this standard, in class actions relating to special education (which are usually brought under the IDEA), plaintiffs can satisfy Rule 23(a)'s commonality requirement by identifying a uniformly applied, official policy of the school district, or an unofficial yet well-defined practice, that drives the alleged violation.[15]  See, e.g., DL, 713 F.3d at 131; Jamie S., 668 F.3d at 498.

So, for example, classes have been certified under the IDEA to challenge: (1) a school district's policy, called "upper-level transfer," of automatically moving students who had aged out of autism support classrooms at one school to another school, without involving the students' IEP teams, P.V. ex rel. Valentin v. Sch. Dist. of Phila., 289 F.R.D. 227, 229 (E.D. Pa. 2013); and (2) a district's policy of delaying the start of services offered in IEPs, like speech therapy, until two weeks into the school year, R. A-G ex rel. R.B. v. Buffalo City Sch. Dist. Bd. of Educ., No.

_____

constitutionally impermissible as to all individuals).  The same is true for the case cited in their Rule 28(j) letter.  See Brown v. D.C., No. 17-7152, 2019 WL 2895992, at *1082 (D.C. Cir. July 5, 2019) (seeing sufficient commonality where "common proof will establish whether the District's plan is 'comprehensive' and 'effectively working'").  Here, in contrast, as we are about to explain, the plaintiffs have not identified a common policy or practice driving the alleged wrongdoing.

[15]    The commonality standard might also be satisfied in some cases by certifying sub-classes.  See, e.g., Mark C. Weber, IDEA Class Actions After Wal-Mart v. Dukes, 45 U. Tol. L. Rev. 471, 498-500 (2014).  But that is not a viable option here.

12-CV-960S, 2013 WL 3354424, at *11 (W.D.N.Y. July 3, 2013), aff'd sub nom. R.A.G. ex rel. R.B. v. Buffalo City Sch. Dist. Bd. of Educ., 569 F. App'x 41 (2d Cir. 2014). In these examples, it is easy to see how the policies anchor common questions -- does "upper-leveling" or delaying the start of services violate the IDEA? -- the answers to which could "resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 564 U.S. at 350. In each example, the harm to the class members is (in part) that the policy precludes, across-the-board, the individualized assessments and services that the IDEA requires and that harm is likely to have similar causes (the policy) and effects (denial of services appropriate to that individual student) across the class. See R. A-G ex rel. R.B., 2013 WL 3354424, at *10 (relying on similar reasoning in certifying an IDEA class).

Identification of an unofficial yet well-defined practice (or set of practices) that is consistently and uniformly applied might also satisfy the commonality prerequisite. See, e.g., DL, 713 F.3d at 131 (defining such practices); Jamie S., 668 F.3d at 498 (similar). But, in a suit like this one challenging hundreds of individualized decisions made in a decentralized environment, satisfying the commonality requirement in this way requires proof of some "common mode of exercising discretion." Wal-Mart, 564 U.S. at 356.

- 31 -

The plaintiffs say that they have satisfied this standard by offering "<u>evidence</u> that Springfield engages in common practices of disability discrimination and that those practices create harms common to the children of the proposed class." Plaintiffs frame the "question[] of law . . . common to the class," Fed. R. Civ. P. 23(a)(2), as: "whether Springfield discriminates against the class, in violation of the ADA, by failing to provide SBBS in neighborhood schools and instead placing them in the inferior Public Day School where they are segregated and deprived of educational opportunities equal to those provided to their peers without a disability." Searching for an answer to that question able to drive the resolution of the litigation, plaintiffs point to the report of their expert, Dr. Peter Leone. They characterize Dr. Leone's report as finding the following: (1) "that Springfield made common (incorrect) assumptions about the class members and offered them a common set of (insufficient) services;" (2) "that <u>all</u> the children whose files he reviewed could successfully attend neighborhood schools if appropriate services were provided;" and (3) "that the quality of education in the Public Day School -- for every child there -- was markedly inferior to the quality of education the children in the potential class would have received in neighborhood schools."

The problem with the plaintiffs' reliance on Dr. Leone's report is that the report claims to find a pattern of legal harm

common to the class without identifying a particular driver -- "a uniform policy or practice that affects all class members" -- of that alleged harm. DL, 713 F.3d at 128 (explaining that this type of evidence is insufficient to satisfy commonality). Similar problems were fatal to the evidence presented by the proposed class in Wal-Mart. There, the plaintiffs alleged that female employees of Wal-Mart had "suffered a Title VII injury" apt for class resolution, Wal-Mart, 564 U.S. at 350, but the Supreme Court held that the commonality requirement was not satisfied because plaintiffs had offered no "glue holding the alleged reasons" for the alleged Title VII violations together, id. at 352. Significantly, Wal-Mart managers were given discretion to make employment decisions about individual employees. See id. at 343. And the Supreme Court found it "quite unbelievable that all managers would exercise their discretion in a common way without some common direction." Id. at 355. Plaintiffs identified no common, official policy or direction, and the Supreme Court held that the plaintiffs' statistical and anecdotal evidence did not prove a "common mode of exercising discretion." Id. at 356; see also id. at 356-58.

Here, the plaintiffs do not, in Dr. Leone's report or elsewhere, allege that a particular, official SPS policy violated the ADA. Indeed, basic facts would belie a claim that SPS had a uniform policy governing the placements and services of students

with behavioral disabilities:  it is telling that SPS educates a larger number of students with behavioral disabilities in neighborhood schools than it does in SPDS.  And it is revealing that some neighborhood schools offer support programs for students with behavioral disabilities.  See S.S. II, 318 F.R.D. at 215 (describing the Social Behavioral Support (SEBS) program and the Positive Behavioral Interventions and Supports (PBIS) program).

Nor does Dr. Leone's report claim that individual IEP teams exercised discretion in a common manner.  For his study, Dr. Leone scrutinized the materials of twenty-four individual students enrolled at SPDS and 130 IEPs of other individual SPS students with behavioral difficulties.  His study yielded no evidence that SPS places students at SPDS using some method, such as boilerplate IEPs, that would suggest a "common mode of exercising discretion."[16]  Wal-Mart, 568 U.S. at 356.

Absent such a common driver, answering the plaintiffs' suggested question -- does the failure to provide SBBS result in

_____

[16]    Dr. Leone's report also does not "raise any inference that all the individual, discretionary" decisions that make up the class violated the law.  Wal-Mart, 564 U.S. at 358.  Such an inference might satisfy commonality.  Id.  Defendants moved to exclude or limit Dr. Leone's testimony because "the methodologies used and opinions offered by Leone suffer from a host of methodological flaws."  The district court declined to rule on this motion, deeming it moot once class certification had been denied.  S.S. II, 318 F.R.D. at 224.  Defendants have not appealed this ruling, so we do not evaluate Dr. Leone's methodology.  Instead, we see Dr. Leone's evidence as insufficient in volume and nature to raise such an inference.

violations of the ADA? -- requires individualized determinations which defeat commonality. See Jamie S., 668 F.3d at 498 (concluding that the proposed common question "must be answered separately for each child based on individualized questions of fact and law, and the answers are unique to each child's particular situation"); see also DL, 713 F.3d at 128 (stating that "claims appear to be based on multiple, disparate failures to comply with the [District's] statutory . . . obligations rather than a truly systemic policy or practice which affects them all" (first alteration in original) (quoting Jamie S., 668 F.3d at 504-05)). For one, whether a given student's placement at SPDS violates the ADA by unlawfully segregating the student or by providing unequal educational benefits will depend on that one student's unique disability and needs. And whether the failure to provide SBBS is the cause of any ADA violations will also depend on whether SBBS would be effective for a particular child. Yet, importantly, as the district court explained, "the term SBBS was created for this litigation," and does not "refer[] to a single program that has been formally studied and found effective for students like those in the proposed class." S.S. II, 318 F.R.D. at 216. On the evidence offered by plaintiffs, then, the question -- does the failure to provide SBBS violate the ADA? -- is likely to yield individualized rather than common answers. The district court

thus did not abuse its discretion in denying class certification for lack of commonality.

Next, the district court held that all class members must exhaust before forming a class, "[s]ince the members of the proposed class may achieve a remedy through an IDEA administrative hearing related to the claims raised here." S.S. II, 318 F.R.D. at 222. We do not go so far. Plaintiffs argue that we should adopt a rule that no one other than the class representative is required to exhaust. The school system says that we should adopt a rule that all class members must exhaust. We decline to do either here.

As to the plaintiffs' argument, there are simply too many factual variations, and the relief sought is too broad, to say here that only the class representative must exhaust.[17] Plaintiffs do not say if any members of the putative class have exhausted their IDEA remedies, save for S.S. Again, the putative class is "[a]ll students with a mental health disability who are or have been enrolled in SPS's Public Day School who are not being educated in an SPS neighborhood school." Surely, relevant facts

---

[17] Although M.W. has not exhausted, we nevertheless address the scenario of a class representative who has exhausted because S.S, who did exhaust, was the class representative at the time of the district court's ruling. This moots the plaintiffs' argument that "it would be appropriate to allow Plaintiff a reasonable period of time to identify a different replacement class representative" who has exhausted.

about the affected students -- such as the type and degree of mental health disability -- differ substantially across this group, and accordingly the administrative processes and results might differ substantially as well.  Adoption of the plaintiffs' position that only a single class representative need exhaust before going forward with a class action would undermine the broader purposes of the exhaustion requirement.  We must respect, as a general matter, "the notion, grounded in deference to Congress' delegation of authority to coordinate branches of Government, that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer."  McCarthy v. Madigan, 503 U.S. 140, 145 (1992), superseded by statute on other grounds, as recognized in Booth v. Churner, 532 U.S. 731, 740 (2001).  On the facts pled and the claims made and without more, we cannot accept the argument that only the class representative need exhaust, which would render the exhaustion requirement nearly meaningless here.

In several cases cited by the plaintiffs, the suits were attempting to challenge what were characterized as a policy or practice.  See Handberry v. Thompson, 446 F.3d 335, 343 (2d Cir. 2006) ("IDEA exhaustion in the instant case is excused under the futility exception for challenges addressing systemic issues."); Hoeft, 967 F.2d at 1305 (considering whether violations were "truly

systemic").[18]  These cases do not stand for the much broader proposition that when, as here, no common policy or practice is plausibly challenged, only the class representative must exhaust. Further, in Hoeft, the Ninth Circuit referred to "representative plaintiffs," in the plural, as part of the prerequisite for "class-wide judicial intervention."  Id. at 1309.  As to cases concerning actions under Title VII, plaintiffs there challenged "any policy, practice, custom or usage," Albemarle Paper Co. v. Moody, 422 U.S. 405, 408 (1975), or "employment practices," Lewis v. City of Chi., 560 U.S. 205, 208 (2010).  Further, Congress had expressly "ratified this construction of [Title VII]" in the specific context of the award of backpay to a class member who had not exhausted. Albemarle Paper, 422 U.S. at 414 n.8.  Albemarle did not create a general rule for all class actions, across all statutory contexts; the plaintiffs read this case far too broadly.

Our approach is similar to that of the Tenth Circuit in Association for Community Living in Colorado v. Romer, 992 F.2d 1040 (10th Cir. 1993), which the plaintiffs cite.  "[W]e do not hold that every plaintiff in a class action must exhaust the IDEA's

_____

[18]    The same is true for the published district court cases cited by the plaintiffs, which they acknowledge address systemic issues.  See T.R. v. Sch. Dist. of Phila., 223 F. Supp. 3d 321, 330 n.7 (E.D. Pa. 2016) (addressing "systemic deficiencies"); L.M.P. ex rel. E.P. v. Sch. Bd. of Broward Cty., Fla., 516 F. Supp. 2d 1294, 1300 (S.D. Fla. 2007) (addressing alleged "systemic violations").

administrative remedies" in every conceivable IDEA case.  Id. at 1045 (emphasis added).  Perhaps in some cases, exhaustion of some number of truly representative claims would suffice for a class action to go forward, presuming the other requirements for class certification were met.  And we think it possible that, on a particular set of facts and claims, all class members would indeed have to exhaust.  Here, the plaintiffs do not offer us any argument in this area except that it suffices for a single class representative to exhaust.  Accordingly, we deem as waived any argument about the greater-than-one number and the type(s) of class members who would need to exhaust for a proper class action on these facts.  See Landrau-Romero v. Banco Popular de P.R., 212 F.3d 607, 616 (1st Cir. 2000) ("It is well settled that arguments not raised in an appellant's initial brief are waived.").  We need not venture further into this area, then, as we decide only the case and arguments in front of us.  Our conclusion that exhaustion by a single plaintiff does not suffice here supports our holding on the denial of class certification.

V.

We now turn to the appeals from the district court's order granting judgment on the pleadings for Springfield and SPS on DLC and PPAL's claims.  Recall that the district court held that DLC and PPL have standing but dismissed their claims for failure to exhaust.  See S.S. III, 332 F. Supp. 3d at 370.  Our

review of the district court's order is de novo. See Doe v. Brown Univ., 896 F.3d 127, 130 (1st Cir. 2018). We must rely only on the facts in the complaint and view those in the light most favorable to the plaintiffs. See id.

PPAL and DLC seek to bring this suit on behalf of "PPAL and DLC constituents," whom the complaint alleges are harmed in the same ways as S.S. and the proposed "Plaintiff class." The complaint alleges that all children with mental health disabilities are PPAL's constituents and that all individuals with mental illnesses are DLC's constituents. PPAL and DLC thus seek to sue on behalf of a group of students coextensive with the proposed class (although their constituent groups are far broader than that purported class).[19] We affirm the district court's grant of judgment on the pleadings for defendants on the ground that PPAL and DLC lack standing.

To establish standing under Article III of the Constitution, a plaintiff must show injury that can be fairly traced to the challenged conduct and that is likely to be redressed by a favorable decision. See, e.g., Mangual v. Rotger-Sabat, 317 F.3d 45, 56 (1st Cir. 2003). These requirements ensure that plaintiffs have a stake in the outcome that is sufficiently

---

[19] We do not engage in an analysis of whether there are any possible divergent interests among the constituents which might undermine standing.

concrete and personal to maintain a justiciable case or controversy. See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992).

"Even in the absence of injury to itself, an association may have standing solely as the representative of its members." Warth v. Seldin, 422 U.S. 490, 511 (1975). In such a suit, to satisfy the Constitution's requirements, the association must show that its members have an injury "that would make out a justiciable case had the members brought suit." Id.; see also United Food & Commercial Workers Union v. Brown Grp., Inc., 517 U.S. 544, 555–56 (1996) (discussing the constitutional nature of this requirement). But the inquiry does not end there. Prudential concerns often bar a third party from suing on behalf of others who choose not to sue.[20] See, e.g., United Food, 517 U.S. at 556; Flast v. Cohen, 392 U.S. 83, 99 n.20 (1968) ("[A] litigant will ordinarily not be permitted to assert the rights of absent third parties."). Representative standing is inappropriate for prudential reasons, for example, if "the nature of the claim and

---

[20] Although the Supreme Court has said that certain prudential standing doctrines may be "in some tension with . . . the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging," Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 126 (2014) (internal quotation marks omitted) (revising the "zone of interests" test and bar on "generalized grievances"), the Court's cases discussing the prudential limits on third-party suits remain good law.

of the relief sought" requires the participation of individual members. <u>Hunt</u> v. <u>Wash. State Apple Advert. Comm'n</u>, 432 U.S. 333, 343 (1977).

The defendants do not dispute that two students identified in the complaint, S.S. and N.D., are constituents of PPAL and DLC who would have individual standing were they to bring suit. The defendants argue that this showing is insufficient to satisfy the Constitution's minimum requirements because PPAL and DLC are constituent-based organizations, rather than associations made up of members who have control over governance.[21] Even assuming that DLC and PPAL can show a justiciable case or controversy, they cannot bring suit for the prudential reasons we are about to outline.

As a general prudential matter, the failure to exhaust by members of the proposed class (i.e., those students who had not gone through the IDEA's administrative procedures) cuts against standing for both DLC and PPAL. Hundreds of students cannot sue

---

[21] We need not resolve this argument by defendants. We note nonetheless that other circuits have rejected this argument as to P & As like DLC, based on statutorily mandated structural and governance features of P & As. See <u>Or. Advocacy Ctr.</u> v. <u>Mink</u>, 322 F.3d 1101, 1111–13 (9th Cir. 2003); <u>Doe</u> v. <u>Stincer</u>, 175 F.3d 879, 885–86 (11th Cir. 1999). Further, PPAL fails to plead in the complaint that it has similar features. See <u>Disability Advocates, Inc.</u> v. <u>N.Y. Coal. for Quality Assisted Living, Inc.</u>, 675 F.3d 149, 159 (2d Cir. 2012) (concluding that the record did not plausibly allege that an organization could be deemed a membership organization for standing purposes).

individually here without IDEA exhaustion, as we have explained above, and so there is no clear reason why the organizations should be able to essentially press those students' claims in the aggregate without that exhaustion.  Put another way, it would not make sense to allow the organizations here to escape the exhaustion requirement for the students they are purportedly representing. Otherwise, associational standing in this type of suit would be inconsistent with the Congressional requirement of exhaustion in the IDEA, 20 U.S.C. § 1415(*l*), and indeed an easy way to circumvent it, which we have cautioned against in a range of contexts, see, e.g., Roman-Martinez v. Runyon, 100 F.3d 213, 220 (1st Cir. 1996) ("To hold otherwise would allow appellant to circumvent the exhaustion requirement . . . .").  After all, in associational standing we consider in part "administrative convenience and efficiency," which could be undercut in allowing organizations to make an end run around the IDEA's exhaustion requirement in a case like this.  United Food, 517 U.S. at 557.

We continue with DLC in particular.  "[C]ongress may abrogate" prudential "impediment[s]" to representative suits. United Food, 517 U.S. at 558.  And the plaintiffs argue that Congress has done so here for DLC.  In PAIMI, Congress authorized P & As like DLC to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness."  42 U.S.C. § 10805(a)(1)(B).  By authorizing it

to sue on behalf of people with mental illness, DLC says, Congress removed all prudential barriers to suits, including this one, that DLC might bring on behalf of its constituents.  We disagree.

We do not see in the text of this statute any indication that Congress abrogated consideration of the prudential concerns present here or that Congress meant to authorize DLC to bring this particular type of suit.  See Mo. Prot. & Advocacy Servs., Inc. v. Carnahan, 499 F.3d 803, 810 n.7 (8th Cir. 2007) ("Congress has not abrogated prudential standing requirements by expressly authorizing this type of global challenge to [public] programs absent the participation of individuals seeking redress of specific injuries.").  As discussed, DLC seeks to sue on behalf of hundreds of children who have not chosen to sue or even to pursue related administrative remedies.  The complaint, as we have explained in our analysis of exhaustion and commonality, concerns multiple facets of each child's special education program.  The suit thus raises concerns about representativeness.  And, in its scale and complexity, the suit poses challenges of judicial administration and efficiency not present in more run-of-the-mill proceedings that Congress might have envisioned.[22]  See United

---

[22]    We agree that there are suits DLC can bring on behalf of individuals with mental illness; we hold, more narrowly, that this is not such a suit.  Another provision buttresses this conclusion about Congress's intent.  PIAMI further requires that "[p]rior to instituting any legal action in a Federal or State court on behalf

Food, 517 U.S. at 557 (explaining that prudential bars to representative standing sound in "administrative convenience and efficiency").

Chief among these are problems of "individualized proof." Int'l Union, UAW v. Brock, 477 U.S. 274, 287 (1986) (quoting Warth, 422 U.S. at 515-16); see also Bano v. Union Carbide Corp., 361 F.3d 696, 714 (2d Cir. 2004) (stating that an "organization lacks standing to assert claims of injunctive relief on behalf of its [constituents] where 'the fact and extent' of the injury that gives rise to the claims for injunctive relief 'would require individualized proof'" (quoting Warth, 422 U.S. at 515-16)). For the reasons discussed in detail in the commonality section, adjudication of the claims here would turn on facts specific to each student, including unique features of each student's unique disability, needs, services, and placement. Efficient and successful judicial resolution of the claims would thus require participation and cooperation by numerous students

_____

of an individual with mental illness, an eligible [P & A] . . . shall exhaust in a timely manner all administrative remedies where appropriate." 42 U.S.C. § 10807(a). This provision contemplates suits on behalf of "an individual with mental illness." And this exhaustion requirement, phrased as it is in individual terms, would be incompatible with authorizing P & As to bring suits like this one on behalf of hundreds of individuals. That is especially true given that, as we have already explained, this suit is subject to the IDEA's exhaustion requirement.

- 45 -

and parents.    And, as we stated, representative standing is inappropriate where such participation is necessary.

PAIMI's text does not authorize DLC to bring claims of this scale and complexity on behalf of hundreds of constituents. The same prudential considerations just outlined bar PPAL, which does not claim congressional authorization to sue, from bringing this suit.

VI.

Affirmed.